Filed 8/22/14  P. v. Rubalcava CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PAUL RUBALCAVA,<br><br>    Defendant and Appellant. | H040024<br>(Santa Clara County<br> Super. Ct. No. 211896) |

Paul Rubalcava (Rubalcava) appeals from a July 25, 2013 order committing him as a sexually violent predator (SVP) to an indeterminate term in the custody of the California Department of Mental Health (DMH) pursuant to Welfare and Institutions Code[1] section 6600 et seq., the Sexually Violent Predator Act (SVPA or Act).[2]

Rubalcava mounts several constitutional challenges to the SVPA and maintains that the court's determination that he is an SVP was not supported by sufficient evidence. We find Rubalcava's contentions to be without merit.  We affirm the order of the trial court committing Rubalcava to the custody of the DMH.

---

[1]    All unspecified section reference as to the Welfare and Institutions Code.

[2]    The Legislature amended the SVPA effective June 27, 2012, to reflect that the Department of Mental Health is now the State Department of State Hospitals and the Director of Mental Health is now the Director of State Hospitals.  (See *People v. Gonzales* (2013) 56 Cal.4th 353, 356 (*Gonzales*); Stats. 2012, ch. 24, §§ 63, 65, 138-146, pp. 85, 117-126.)  We use the prior nomenclature, which was used by the trial court in its commitment order.

*Procedural History*

On September 29, 2011, the Santa Clara County District Attorney filed a petition to commit Rubalcava as an SVP pursuant to section 6604. After Rubalcava waived his right to a jury trial and his right to be present at trial, the court conducted a bench trial at which the district attorney presented the testimony of three doctors. Rubalcava presented the testimony of three doctors and a psychiatric technician from Coalinga State Hospital.

On July 25, 2013, the court found the petition to be true. As noted, the court committed Rubalcava to the custody of the Department of Mental Health for an indeterminate term.

Since Rubalcava makes various constitutional challenges to the SVPA as amended in 2006, and challenges his commitment as an SVP on the ground that there was insufficient evidence to support the court's determination that he is an SVP, we set forth in detail the law applicable to this case.

*McKee I and McKee II*

In *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), the California Supreme Court summarized the SVPA and Proposition 83's 2006 amendment of the Act. (*Id.* at pp. 1185-1188). The *McKee I* court explained the changes to the SVPA as follows:

"The Act, as originally enacted (Stats. 1995, ch. 763, § 3, p. 5922), provided for the involuntary civil commitment for a two-year term of confinement and treatment of persons who, by a unanimous jury verdict after trial [citation], are found beyond a reasonable doubt to be an SVP [citation]. [Citations.] A person's commitment could not be extended beyond that two-year term unless a new petition was filed requesting a successive two-year commitment. [Citations.] On filing of a recommitment petition, a new jury trial would be conducted at which the People again had the burden to prove beyond a reasonable doubt that the person was currently an SVP. [Citations.]" (*McKee I*, *supra*, 47 Cal.4th at p. 1185.)

2

"As originally enacted, an SVP was defined as 'a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' [Citation.]  A 'sexually violent offense' included a Penal Code section 288 lewd act on a child under age 14.  [Citations.]  Under the Act, a person is 'likely' to engage in sexually violent criminal behavior (i.e., reoffend) if he or she 'presents a substantial danger, that is, a serious and well-founded risk, that he or she will commit such crimes if free in the community.'  [Citation.]"  (*McKee I*, *supra*, 47 Cal.4th at p. 1186.)

"On November 7, 2006, California voters passed Proposition 83, entitled 'The Sexual Predator Punishment and Control Act: Jessica's Law' amending the Act effective November 8, 2006."  (*McKee I.*, *supra*, 47 Cal.4th at p. 1186.)  "Proposition 83 . . . changes an SVP commitment from a two-year term to an indefinite commitment."  (*Ibid*.)

"Pursuant to Proposition 83, section 6604 . . . now provides in relevant part:  'If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an *indeterminate* term to the custody of the [DMH] for appropriate treatment and confinement . . .'  (Italics added.)  Proposition 83 did not change section 6604's requirement that a person's initial commitment as an SVP be proved at trial beyond a reasonable doubt.  Under Proposition 83, section 6605 continues to require current examinations of a committed SVP at least once every year.  (§ 6605, subd. (a).)  However, Proposition 83 added new provisions to section 6605 regarding the DMH's obligations:  Pursuant to section 6605, subdivision (a), the DMH now files an annual report in conjunction with its examination of SVP's that 'shall include consideration of whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed

3

that would adequately protect the community.'  Subdivision (b) now provides that '[i]f the [DMH] determines that either:  (1) the person's condition has so changed that the person no longer meets the definition of a sexually violent predator, or (2) conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the director shall authorize the person to petition the court for conditional release to a less restrictive alternative or for an unconditional discharge.'  (§ 6605, subd. (b).)  If the state opposes the director's petition, then, as under the pre-Proposition 83 statute, it must prove beyond a reasonable doubt that the person still meets the definition of an SVP."  (*McKee I*, *supra*, 47 Cal.4th at pp. 1186-1187.)

"In the event the DMH does *not* authorize the committed person to file a petition for release pursuant to section 6605, the person nevertheless may file, as was the case with the pre-Proposition 83 Act, a petition for conditional release for one year and subsequent unconditional discharge pursuant to section 6608.  [Citation.]  Section 6608, subdivision (i), which was . . . unamended by the Act, provides:  'In any hearing authorized by this section, *the petitioner shall have the burden of proof by a preponderance of the evidence*.'  (Italics added.)  After a trial court denies a section 6608 petition, 'the person may not file a new application until one year has elapsed from the date of the denial.'  [Citation.]"  (*McKee I*, *supra*, 47 Cal.4th at p. 1187.)

The *McKee I* court concluded, "In short, under Proposition 83, an individual SVP's commitment term is indeterminate, rather than for a two-year term as in the previous version of the Act.  An SVP can only be released conditionally or unconditionally if the DMH authorizes a petition for release and the state does not oppose it or fails to prove beyond a reasonable doubt that the individual still meets the definition of an SVP, or if the individual, petitioning the court on his own, is able to bear the burden of proving by a preponderance of the evidence that he is no longer an SVP.  In other words, the method of petitioning the court for release and proving fitness to be released, which under the

4

former Act had been the way an SVP could cut short his two-year commitment, now becomes the only means of being released from an indefinite commitment when the DMH does not support release." (*McKee I*, *supra*, 47 Cal.4th at pp. 1187-1188, fn. omitted.)

In *McKee I*, the California Supreme Court rejected the defendant's constitutional challenges to the 2006 amendments except as to the defendant's equal protection claim. (*McKee I*, *supra*, 47 Cal.4th at pp. 1188-1196.) As to the defendant's equal protection argument, the California Supreme Court recognized that persons civilly committed as MDO's (mentally disordered offender) or NGI's (not guilty by reason of insanity) are subject to short, definite terms of commitment, whereas persons found to be SVP's are committed to an indeterminate term of commitment. (*Id.* at pp. 1202, 1207.) The court concluded that SVP's were similarly situated to these other groups of committees. (*Id*. at pp. 1204, 1207.) The *McKee I* court remanded the matter to the San Diego County Superior court "to determine whether the People . . . can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*Id*. at pp. 1208-1209, fn. omitted.)

Following an extensive evidentiary hearing on remand, the San Diego County Superior Court concluded that the People had met their burden to justify the disparate treatment of SVP's under the standards set forth in *McKee I*. (*People v*. *McKee* (2012) 207 Cal.App.4th 1325, 1330, 1332 (*McKee II*).) On appeal, the reviewing court reached the same conclusion: "[T]he trial court correctly found the People presented substantial evidence to support a reasonable perception by the electorate that SVP's present a substantially greater danger to society than do MDO's or NGI's, and therefore the disparate treatment of SVP's under the Act is necessary to further the People's compelling

5

interests of public safety and humane treatment of the mentally disordered." (*Id*. at pp. 1330-1331.)[3]

*Due Process Challenge to the SVPA*

Rubalcava contends that the 2006 amendments to the SVPA violate the constitutional protection provided by the due process clauses of the federal and state Constitutions. His arguments on this point were rejected in *McKee I*, *supra*, 47 Cal.4th at pages 1188-1193, but he is raising it for potential future federal review. We consider the issue as having been raised; however, we reject it. We are bound to follow *McKee I*. (*Auto Equity Sales*, *Inc*. *v*. *Superior Court* (1962) 57 Cal.2d 450, 455.)

*Equal Protection*

Rubalcava maintains that the appellate court in *McKee II* failed to "properly" conduct a de novo review even though the court stated that it was to conduct de novo review of the trial court's determination. Rubalcava asserts that the *McKee II* court "three times referred to the 'substantial evidence' standard of review, which is deferential rather than independent."[4]

---

[3]    It is with much of the *McKee II* opinion that Rubalcava takes issue.

[4]    The *McKee II* court stated: "McKee asserts, and we agree, that we review de novo the trial court's determination whether the Act, as amended by Proposition 83, violates his equal protection rights. We independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the Act. Although the trial court heard the testimony of many witnesses and received in evidence many exhibits, the instant constitutional question involved mixed questions of law and fact that are predominantly legal, if not purely legal questions, which are subject to de novo review. [Citations.] Furthermore, because in this case the trial court presumably did not decide any disputed historical facts, but determined only whether the People presented sufficient evidence to support a reasonable perception that SVP's pose a greater danger to society, we are in as good a position as the trial court to make that determination. Therefore, we apply an independent standard in reviewing the trial court's order rejecting McKee's equal protection claim." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338.)

6

In essence, Rubalcava asserts that the appellate court mischaracterized its duty "as determining 'whether the People presented substantial evidence to support a reasonable inference or perception that the Act's disparate treatment of SVP's is necessary to further compelling state interests.' [Citation.]" Rubalcava contends that this "does not describe de novo review. Nor did the actual review the Court undertook satisfy the de novo standard."

The *McKee II* opinion does not suggest that the appellate court used the word "substantial" to refer to the substantial evidence test rather than to constitutional sufficiency of the evidence. It is apparent from *McKee II* that the appellate court understood that the burden was on the government to present sufficient evidence to satisfy the strict scrutiny standard. (See *McKee II*, *supra*, 207 Cal.App.4th at pp. 1335, 1338, fn. 3.)

Rubalcava asserts that in conducting its analysis the *McKee II* court detailed two studies and the testimony presented by the prosecution without mentioning a single witness or study presented by McKee. Our careful review of *McKee II* does not disclose that the appellate court failed to independently consider all the evidence presented by the parties. The appellate court indicated that McKee presented the testimony of 11 witnesses and documentary evidence. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1332.) Even though *McKee II* did not summarize McKee's evidence, we must presume that the appellate court reviewed it. (Evid. Code, § 664 [it is presumed that official duty has been regularly performed]; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [all intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown].) Furthermore, the appellate court was aware of the California Supreme Court's admonition in *McKee I*, *supra*, 47 Cal.4th at page 1210 that "mere disagreement among experts will not suffice to overturn the Proposition 83 amendments." (*McKee II*, *supra*, at p. 1338.) It was not required to recite McKee's evidence.

The appellate court's description of its standard of review in *McKee II* is entirely consistent with an independent, de novo review of the evidence and the Supreme Court's opinion and guidance in *McKee I*. (See *McKee I*, *supra*, 47 Cal.4th at pp. 1206-1211.) In sum, we reject Rubalcava's claim that *McKee II* applied a deferential, rather than an independent, standard of review.

Rubalcava argues that the appellate court misunderstood and misapplied the strict scrutiny standard that the *McKee I* court held was the proper standard of review for an equal protection argument involving involuntary commitments. Rubalcava argues that the appellate court's description of the strict scrutiny test "more closely resembles the rational basis test."

Undoubtedly, the *McKee II* court was *not* applying the rational basis test. The court stated: " 'Strict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment.' [Citation.] Applying the strict scrutiny standard, the state has the burden of establishing it has a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose. [Citation.] Alternatively stated, applying the strict scrutiny standard, a law 'is upheld only if it is necessary to further a compelling state interest.' [Citation.]" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1335.) Plainly, the *McKee II* court understood that the strict scrutiny test required the government to "show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.]" (*Id*. at p. 1349.)

We note that the United States Supreme Court has used similar language to describe the strict scrutiny test consistent with the above description in *McKee II*. The high court has said: "[W]e have treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.' With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been

8

precisely tailored to serve a compelling governmental interest." (*Plyler v. Doe* (1982) 457 U.S. 202, 216-217, fns. omitted.)  The high court has indicated that the validity of laws burdening constitutionally protected rights challenged under the equal protection clause "depends upon whether they are necessary to further compelling state interests [citation]." (*American Party of Texas v. White* (1974) 415 U.S. 767, 780-781 [conditions limiting access to general election ballot]; see *Dunn v. Blumstein* (1972) 405 U.S. 330, 342 [where duration residency requirements impinge on constitutional rights, the state must demonstrate that such laws are necessary to promote a compelling governmental interest].)

In deciding whether the People satisfied the strict scrutiny test, the *McKee II* court examined evidence in three areas: recidivism, the greater trauma of victims of sexual offenses, and the diagnostic and treatment differences. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1340-1347.)  Rubalcava contends that the *McKee II* court accepted as accurate the evidence presented by the prosecution, without any discussion of credibility or reliability.  *McKee II* gives us no reason to believe that the evidence discussed was unreliable or inaccurate; nevertheless, the appellate court accepted it as constitutionally sufficient.  As the California Supreme Court has explained, the evidence produced to satisfy the strict scrutiny test must be factually based but not necessarily "incontrovertible or uncontroversial." (*McKee I*, *supra*, 47 Cal.4th at pp. 1210-1211.)

With respect to recidivism, the *McKee II* court concluded that the Static-99 evidence supported "by itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1342.)  That evidence included DMH data "showing a significant difference between the Static-99 scores of SVP's and those of MDO's/NGI's." (*Id*. at p. 1341.)  "The average Static-99 score for all SVP's civilly committed since the passage of the amended Act in 2006 is 6.19," which "place[d] SVP's in the 'high' risk category for sexual reoffense." (*Ibid*.)  However, the average Static-99 score for MDO's at Patton

State Hospital subject to sex offender registration requirements in 2010 was only 3.6, which placed them "in the 'moderate-low' risk category for sexual reoffense." (*Ibid*.) The average Static-99 score for all patients discharged from Atascadero State Hospital since January 1, 2010 and subject to sex offender registration requirements, a group including MDO's and NGI's, was 4.6, which placed them "in the 'moderate-high' risk category for sexual reoffense." (*Id*. at pp. 1341-1342.)

The *McKee II* court concluded that there was "substantial evidence supporting the reasonable perception that the nature of the trauma caused by sex offenses is generally more intense or severe than the trauma caused by nonsex offenses and is sometimes unique to sex offenses." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1343.) The *McKee II* court discussed the expert testimony that it relied upon in reaching that conclusion. (*Id*. at pp. 1342-1343.)

The *McKee II* court determined that there was "substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses from those of MDO's and NGI's, and that their respective treatment plans, compliance, and success rates are likewise significantly different." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.) The distinctions made SVP's more difficult to treat and less likely to participate in treatment. (*Ibid*.) SVP's are "less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative." (*Ibid*.)

The evidence discussed in *McKee II* indicated that "[o]nly 2 percent of MDO's and NGI's suffer from pedophilia or other paraphilias" whereas "nearly 90 percent of SVP's are diagnosed with pedophilia or other paraphilias." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1344.) "Dr. David Fennell, a psychiatrist and chief of forensics at Atascadero State Hospital, testified that about 90 percent of MDO and NGI patients suffer from a psychotic mental disorder" but "only 1 to 3 percent of SVP's suffer from a psychosis." (*Ibid*.)

10

The *McKee II* court had before it evidence that "[p]araphilia typically remains stable or constant throughout a patient's lifetime." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1345.) "Although there may be an 'aging out' effect where patients' behavior or acting out on their fantasies is decreased as they age, that does not mean their urges and fantasies are similarly decreased. Patients with paraphilia generally have a specific intent in selecting victims (e.g., boys age seven to 10 years) and carefully plan and execute their offenses (e.g., by 'grooming' their victims before committing the offense). In contrast, patients with severe mental illnesses generally are not that organized and commit impulsive or opportunistic offenses." (*Ibid.*)

The *McKee II* court reviewed the evidence of significant differences in the treatment of severely mentally ill patients and patients with paraphilia. "Patients with severe mental illnesses generally are first treated with psychotropic medications and then with psychosocial support or intervention (e.g., therapy regarding communication skills, social skills, and problem solving). Their amenability to and compliance with treatment usually is very good. Most severely mentally ill patients are compliant with their medications and participate in treatment most of the time. In comparison, the treatment plans for patients with paraphilia generally involve psychosocial intervention-like treatment. Medications may decrease their sexual arousal, but not their deviant sexual interests. Treatment of paraphilia patients takes longer than for other patients because paraphilia is so pervasive, affecting their thoughts, beliefs, and interactions." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1346.) In addition, a "higher percentage of SVP's (i.e., 10 to 15 percent) have antisocial or borderline personality disorders (i.e., involving pathological lying and instability, etc.) than do severely mentally ill patients, making their treatment more difficult. Also, unlike severely mentally ill patients, 'not very many' SVP's are ready to work and participate in treatment." (*Ibid.*)

In *McKee II*, Dr. Fennell provided testimony regarding the differences between treatment plans for SVP's and those for MDO's and NGI's. (*McKee II*, *supra*, 207

11

Cal.App.4th at p. 1345.)  "MDO's, most of whom are housed at Atascadero, are overwhelmingly treated with psychotropic medications, resulting in their stabilization and amenability to psychosocial support treatment.  About two-thirds of MDO's and NGI's comply with their treatment programs, typically resulting in their decertification after about three years."  (*Id*. at pp. 1344-1345.)  On the contrary, "SVP's treatment plans are not based on medications, but rather on giving them the tools to limit their risk of sexually reoffending."  (*Id*. at p. 1345.)  "The shortest time in which an SVP has completed treatment is two and one-half years.  Many other SVP's took up to five years to complete treatment."  (*Ibid*.)  However "only about 25 percent of SVP's participate in treatment."  (*Ibid*.)

Accordingly, the *McKee II* court concluded that "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended Act's disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released).  [Citation.]"  (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.)  The *McKee II* court held that the SVPA as amended did not "violate McKee's constitutional equal protection rights."  (*Id*. at p. 1348.)

Relying on *Bernal v. Fainter* (1984) 467 U.S. 216 (*Bernal*) and *Dunn v. Blumstein* (1972) 405 U.S. 330, Rubalcava argues that the element of necessity under the strict scrutiny standard required that the prosecution show that the disparate treatment of SVP's constituted the least restrictive means possible.

In *McKee II*, McKee made a similar argument relying on *Bernal*, and the *McKee II* court rejected it.  (*McKee II*, *supra*, 207 Cal.App.4th at p. 1349.)  In *Bernal*, the United States Supreme Court had stated that "[i]n order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available."  (*Bernal*, *supra*, 467 U.S. at p. 219.)  The *McKee II* court described the quoted sentence from *Bernal* as "probable dictum," and distinguished *Bernal* because it involved a suspect

12

class—alienage. (*McKee II*, *supra*, at p. 1349.) The *McKee II* court stated, "We are unaware of any case applying the 'least restrictive means available' requirement to all cases involving disparate treatment of similarly situated classes." (*Ibid*.) "On the contrary, our review of equal protection case law shows the two-part test, as discussed in [*In re*] *Moye* [(1978) 22 Cal.3d 457] and *McKee* [*I*], is the prevailing standard . . . . Therefore, in strict scrutiny cases, the government must show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.] We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered." (*Ibid*.)

We agree that the strict scrutiny test is not satisfied if there is an *equally efficacious* but less constitutionally burdensome means (i.e., less restrictive alternative) of accomplishing a compelling state interest because, in that case, the challenged law would not be narrowly tailored or necessary to further a compelling state interest. However, it is quite apparent that the *McKee II* court understood that the strict scrutiny test required the government to "show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.]" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1349.) Given the evidence produced by the People that many SVP's do not participate in treatment and paraphilia disorders are pervasive, persist for a lifetime, and are not treatable with medication (*id.* at pp. 1345-1346), it appears *McKee II* reached the correct result. Rubalcava fails to make a persuasive argument that the SVPA's imposition of an indeterminate term of commitment and placement of the burden of proof on SVP's who petition for discharge (and the correlative elimination of periodic jury trials in which the People have the burden of proof) are not necessary to further compelling state interests in protecting the public and

13

providing treatment to SVP's or that a four-or five-year term would equally effectuate those interests. Narrow tailoring to serve a compelling state interest does not require exhaustion of every conceivable alternative. (See *Grutter v. Bollinger* (2003) 539 U.S. 306, 339.)

Rubalcava argues that the evidence presented by the People in *McKee II* did not support that court's ruling that SVP's are more dangerous than MDO's and NGI's and because of that harsher treatment is necessary.

We disagree with Rubalcava's contention that the evidence in the *McKee II* trial did not support the appellate court's ruling that SVP's were more dangerous than MDO's and NGI's and thus harsher treatment was necessary. Rubalcava makes several contentions in this regard.

First, Rubalcava claims that the *McKee II* court erroneously concluded that " '[t]he People presented evidence showing the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely for SVP's than for MDO's and NGI's.' (*McKee II*, *supra*, 207 Cal.App.4th at p. 1340.)" Specifically, he contends that *McKee II* relied on two outdated studies conducted by the United States Department of Justice that considered recidivism rates of prisoners released from 15 states, including California, in 1994. It then compared the rate of sexual offending among various criminal classes. Rubalcava asserts that the obvious problem with these studies is that they "were not relevant to the matter at hand. *McKee I* did not hold that SVPs were similarly situated to other sex offenders. It held that SVPs were similarly situated to MDOs and NGIs."

In *McKee II*, the People presented the testimony of three expert witnesses, studies, and the Static-99 data comparing recidivism rates. The *McKee II* court acknowledged that the evidence presented showed only that "the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely than recidivism of sex offenders generally, but does not show SVP's have, in fact, a higher sexual recidivism

14

rate than MDO's and NGI's."  (*McKee II*, *supra*, 207 Cal.App.4th at p. 1342.)

Nevertheless, the court found that the recidivism rate evidence was " 'significant, given

that the goal of the SVP[A] is specifically to protect society from particularly serious

sexual offenses.' "  (*Ibid.*)  In reaching this inference, *McKee II* relied, in part, on

evidence that the scores on the Static-99 test, which assesses the *risk* that a sex offender

will commit new sex offenses, were higher for SVP's than for non-SVP sex offenders.

(*Id.* at p. 1342.)  The court noted that "[r]egardless of the shortcomings or inadequacy of

the evidence on actual sexual recidivism rates, the Static-99 evidence . . . supports, by

itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual

reoffending than do MDO's or NGI's."  (*Ibid.*)  In reaching this conclusion, *McKee II*

followed *McKee I*, where the California Supreme Court suggested that evidence

concerning a greater *risk* of recidivism by SVP's was one type of evidence that the People

might present to show that "notwithstanding the similarities between SVP's and MDO's,

the former as a class bear a substantially greater risk to society, and that therefore

imposing on them a greater burden before they can be released from commitment is

needed to protect society."  (*McKee I*, *supra*, 47 Cal.4th at p. 1208.)

Second, Rubalcava claims that *McKee II* reached its conclusion that victims of sex

offenses suffer greater trauma without receiving any comparative evidence regarding the

trauma caused by nonsex offenses.  Rubalcava contends that (1) the testimony of the

medical experts was focused on child sexual abuse and that "[i]t is unclear if that

testimony is properly extrapolated to adult victims of sexual offenses," and (2) the court

"cited no evidence regarding the effects of other types of crimes and the trauma suffered

by victims of those crimes."

We disagree with Rubalcava.  First, although one of the three medical experts

testified specifically about child sexual abuse, the two other experts testified generally

about sexual abuse victims.  (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1342-1343.)

Second, the evidence relied on by the *McKee II* court included testimony that "[s]exual

15

trauma differs qualitatively from other traumas because of its intrusiveness and long-lasting effects," (*id.* at p. 1342) and that "[d]ysfunction, disassociation and avoidance problems after sexual trauma are unique to sexual abuse and are not seen in victims of physical or other types of abuse." (*Id.* at p. 1343.)

Third, Rubalcava claims that the *McKee II* court's analysis regarding treatment and diagnosis is defective because an SVP may become eligible for release regardless of treatment. Rubalcava asserts that (1) the *McKee II* court, in reviewing the evidence, conducted a substantial evidence review rather than a de novo review, (2) treatment is not actually required before an SVP may be eligible for release, and (3) the *McKee II* court failed to consider whether indeterminate commitments were the least restrictive means and that a commitment term of five years would have been a less restrictive means. Accordingly, he concludes that when strict scrutiny is applied, the prosecution failed to make the necessary showing.

The evidence adduced by the People regarding the risk of harm posed by SVP's because of their greater risk of sexually reoffending and the special harm suffered by victims of sex offenses was sufficient to demonstrate that the state has a compelling interest in protecting the potential victims and treating the mental disorders of SVP's. In its past decisions, the California Supreme Court has acknowledged the existence of such compelling state interest. (See *McKee I, supra*, 47 Cal.4th at p. 1204 [state has a compelling interest in protecting society from dangerous persons and treating mental illness of civil committees].) As our Supreme Court recognized in *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 924, the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes, even if that risk cannot be assessed at greater than 50 percent. Further, as our Supreme Court accepted in *Hubbart v. Superior Court* (1999)

16

19 Cal.4th 1138, 1153, footnote 20, the problem targeted by the SVPA is acute, and the state interests in protection of the public and mental health treatment are compelling.

As to the question whether the SVPA's imposition of an indeterminate term of commitment on SVP's (see § 6604) and its shifting of the burden of proof (see § 6608) are necessary to further the government's compelling state interest, the persistence and pervasiveness of the paraphilia disorders usually suffered by SVP's and their general lack of amenability to treatment must be regarded as particularly relevant to whether they pose a greater danger to society that necessitates an indeterminate term of commitment and the concomitant shifting of the burden of proof for discharge. As indicated, the People adduced evidence that the vast majority of SVP's are diagnosed with pedophilia or other paraphilias, and paraphilia is pervasive and ordinarily persists throughout a patient's lifetime, medication does not decrease the deviant sexual interests of SVP's, treatment is not focused on medication but on tools to limit the risk of reoffense, and most SVP's do not participate in treatment. (See *McKee II*, *supra*, 207 Cal.App.4th at pp. 1344-1346.) On the other hand, only a very small percentage of MDO's and NGI's suffer from pedophilia or other paraphilias, patients with severe mental illnesses are treated with psychotropic medications and then psychosocial therapy and their amenability to and compliance with treatment usually is very good, and two-thirds of MDO's and NGI's comply with their treatment programs and are typically decertified after about three years. (*Ibid*.) In light of this contrasting evidence, we discern no defect in the *McKee II* court's conclusion that "the disparate treatment of SVP's under the Act is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered." (*Id*. at p. 1331.)

We reject Rubalcava's suggestion that the People were required to prove that SVP's are actually more dangerous as a class than MDO's and NGI's by producing evidence allowing a comparison of recidivism rates and the harm suffered by victims of each group. For purposes of strict scrutiny, it is enough that SVP's as a group differ

17

materially from MDO's and NGI's in terms of their diagnosis and treatment and, consequently, their need for ongoing commitment.

Finally, Rubalcava has not suggested that further adjudication of the equal protection issue would produce significantly different evidence than presented in *McKee II*. In light of the Supreme Court's unambiguously expressed intent to avoid an unnecessary multiplicity of proceedings with respect to equal protection challenges in SVP cases (see *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864), the Supreme Court's denial of review in *McKee II*, and our conclusions regarding the asserted flaws in *McKee II*, we find that the equal protection arguments advanced in this appeal are without merit and do not require a remand for a further evidentiary hearing.

*Dismissal of an SVP's Petition for Release without a Hearing*

Rubalcava argues that the 2006 amendment to the SVPA permitting summary dismissal of an SVP's petition violates due process and equal protection. Rubalcava contends that even if an SVP "is able to file a petition, [under section 6608] that petition is subject to being dismissed as frivolous. [Citation.] The statute does not mandate that the court give petitioner notice or a hearing. No other litigant is subject to having their [*sic*] complaints or other initial pleadings dismissed in a summary fashion, and thus, this provision is a violation of equal protection as well as a violation of due process."

Certainly, under section 6608, if an SVP files a petition for conditional release or unconditional discharge without the recommendation or concurrence of the Director of State Hospitals, the court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (§ 6608, subd. (a).)

We note that the defendant in *McKee I* raised a due process challenge to section 6608 similar to the one that Rubalcava raises here. (*McKee I*, *supra*, 47 Cal.4th at p. 1192 [McKee contends that the court's discretion to deny a petition without a hearing

18

as frivolous denies due process].)  The *McKee I* court rejected the argument.  "A frivolous petition is one that 'indisputably has no merit.' [Citation.]  McKee cites no authority for the proposition that due process is violated by not granting such petitions a hearing.  The fact that the statute gives the court the authority to deny such petitions does not, of itself, serve as an obstacle to the primary due process goal of ensuring that only those individuals who continue to meet SVP criteria will remain involuntarily committed."  (*Ibid*.)

However, in *People v. McCloud* (2013) 213 Cal.App.4th 1076, the court held that the defendant's argument that section 6608 violates equal protection was not "wholly without merit" because "[t]here may well be actual disparate treatment of similarly situated persons—and if there is disparate treatment, the state may or may not be justified in so distinguishing between persons."  (*Id*. at p. 1088.)  Accordingly, the court remanded the case to the trial court "so that both parties may fully brief and argue [defendant's] claim that section 6608, subdivision (a), violates the equal protection clause."  (*Ibid*.)

Respondent argues that whatever the merit of Rubalcava's equal protection claim, remand is not appropriate in this case because Rubalcava's appeal is from a decision made under the SVPA's initial commitment procedures (§§ 6601-6604), not from a determination under the postcommitment release procedure set forth in section 6608.  We agree.

"One who seeks to raise a constitutional question must show that his rights are affected injuriously by the law which he attacks and that he is actually aggrieved by its operation."  (*People v. Black* (1941) 45 Cal.App.2d 87, 96; *People v. Cortez* (1992) 6 Cal.App.4th 1202, 1212.)  Simply put, the record must contain evidence showing that Rubalcava is actually aggrieved by the law he attacks.  (*People v. Black*, *supra*, 45 Cal.App.2d at p. 96.)  The record fails to establish that Rubalcava availed himself of the statutory procedures under section 6608, subdivision (a) or that he was aggrieved by the procedure.  "It is a firmly established principle of law that one may not urge the

19

unconstitutionality of a statute unless his [or her] rights are adversely affected thereby [citation]." (*Ventura County v. Southern Cal. Edison Co*. (1948) 85 Cal.App.2d 529, 539.) Under this rule, Rubalcava would appear to have no standing to make the present contention, for his rights are in no way adversely affected nor discriminatorily prejudiced unless or until he files a petition under section 6608, subdivision (a) and the court determines that the petition is frivolous.

It is a "well-settled rule that courts should 'avoid advisory opinions on abstract propositions of law. [Citations.]' " (*People v. Ybarra* (1988) 206 Cal.App.3d 546, 549; *People v. Gonzales* (1994) 29 Cal.App.4th 1684, 1700.) To prevent advisory opinions, courts must wait until a case " 'has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.]" (*Pacific Legal Foundation v. California Coastal Com*. (1982) 33 Cal.3d 158, 171.) Here, the record does not reflect any action taken by Rubalcava pursuant to section 6608, subdivision (a). As such, we find that his equal protection challenge to section 6608 is not ripe.

*Sufficiency of the Evidence that Rubalcava is an SVP*

Rubalcava contends that the evidence was insufficient to support the court's verdict. Specifically, he claims that there was insufficient evidence that he is currently unable to control his behavior and insufficient evidence that he will reoffend in a sexually violent and predatory manner if released.

"In reviewing the evidence sufficient to support a commitment under [the SVPA], 'courts apply the same test as for reviewing the sufficiency of the evidence to support a criminal conviction.' [Citation.]" (*People v. Carlin* (2007) 150 Cal.App.4th 322, 333.) "Thus, this court must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] To be substantial, the evidence must be ' "of ponderable legal significance . . . reasonable

20

in nature, credible and of solid value." ' [Citation.]" (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466.)

In order to prove that Rubalcava is an SVP, the People had to prove, beyond a reasonable doubt, that "(1) [he] has been convicted of a qualifying sexually violent offense . . . ; (2) [he] has a diagnosable mental disorder; (3) the disorder makes it likely he . . . will engage in sexually violent criminal conduct if released; and (4) this sexually violent criminal conduct will be predatory in nature." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 236, 243.)

*Evidence Adduced at Trial*

Psychologist Dr. Douglas Korpi testified that initially he diagnosed Rubalcava with psychosis not otherwise specified with exhibitionistic and pedophilic features. However, he explained that the real diagnosis in this case is "bipolar condition or schizophrenia." Dr. Korpi based his diagnosis on Rubalcava's 20-year history of auditory hallucinations and delusional activity, which had resulted in 11 psychiatric hospitalizations. Dr. Korpi testified that Rubalcava's psychosis caused him to lose self-control and act on his exhibitionist and pedophilic interests. Over a period of 30 years, Rubalcava had been arrested eight times for sexual offenses. Four arrests resulted in convictions. Dr. Korpi stated that Rubalcava's qualifying offense for purposes of an SVP commitment was a 1991 conviction for committing a lewd and lascivious act against a minor. (Pen. Code, § 288, subd. (a).) The victim in that case was his niece who was 12 years old at the time of the offense. In addition to this offense, Rubalcava was arrested for, or convicted of, indecent exposure in 1985, 1989, 1995, 2004, and 2006; and for assault to commit a sex crime and false imprisonment in 2003.

According to Dr. Korpi, since 2006, Rubalcava had been taking his medication except for a short period in 2012; during that time he has not acted out sexually. Dr. Korpi was of the opinion that Rubalcava would not continue to stay on medication voluntarily if released because prior to 2006 he had a long history of not taking his

21

medication. In November 2012, Rubalcava stopped taking his medication and began hallucinating again. In February 2013, Rubalcava told Dr. Sidhu that he was taking his medication only to " 'satisfy the court.' " Dr. Korpi opined that Rubalcava is "compliant when you're watching, and he understands that everybody thinks he needs to take these medications and he'll take these medications if that's what you all want. But he's not fully comprehending of his psychosis, nor is he fully comprehending his need for medication. So there's cracks in the armo[r] throughout even the recent history."

Dr. Korpi explained that Rubalcava continues to go "in and out of states of confusion. So it's going to be hard for him to figure out that he's got a disorder that takes vigilance to take care of and he's got to stay on his medications. He can't go off them. He doesn't fully understand what's wrong with him. He doesn't fully appreciate the meds. He's trying hard and he's done a great job and he's better, but he's still a little bit addled." Dr. Korpi opined, "[i]f he's left to his own devices, he's going to drift off his meds and get lost."

Dr. Korpi clarified that Rubalcava's psychosis has affected his emotional and volitional capacity and has predisposed him to commit sexually violent predatory crimes. Further, based on Rubalcava's scores on two actuarial instruments—the Static 99-R and the Static 2002-R Dr. Korpi opined that Rubalcava presented a serious and well-founded risk of reoffending.

Psychologist Dr. Carolyn Murphy testified as a second expert for the People. She diagnosed Rubalcava with schizoaffective disorder, bipolar type with a secondary diagnosis of pedophilia. She believed that Rubalcava's schizoaffective disorder caused him to be "disorganized," "impulsive" and engage in "hypersexual behavior." Dr. Murphy testified that Rubalcava's qualifying offense for purposes of determining whether he is an SVP was his 1991 offense. Dr. Murphy opined that Rubalcava's mental disorder affected his emotional or volitional capacity in a way that predisposes him to commit criminal sexual acts, that his capacity or ability to control his criminal sexual

22

behavior is seriously and dangerously impaired to a degree that constitutes a menace to the safety and health of others. Furthermore, she opined that if Rubalcava stopped taking his medication he was likely to reoffend in a sexually violent and predatory manner. Based on everything she considered in the case, Dr. Murphy concluded that Rubalcava met the criteria for a sexually violent predator.

Dr. Murphy explained that Rubalcava would benefit from long-term treatment at Coalinga. However, if he were to be released on parole "due to his lack of full insight, due to the lack of potential supports and accessibility to treatment, and due to the fact that he's off the mood stabilizer, it's just a matter of time before [his] symptoms come back. And does he really understand what to look for? No. I think it is a matter of time." Dr. Murphy believed that the only thing that was keeping Rubalcava from reoffending was the medication and structure in the hospital.

A third expert for the People, clinical psychologist Dr. Robert Brook, testified that he diagnosed Rubalcava with "paraphilia not otherwise specified non-consenting victims."[5] Dr. Brook believed that Rubalcava fit the diagnosis of "exhibitionism . . . with non-consenting females"; and a diagnosis of bipolar one disorder was also appropriate. Dr. Brook concluded that Rubalcava was both emotionally and volitionally impaired in such a way that it predisposed him to commit criminal sexual acts; and that his ability to control his violent and sexual behavior was seriously and dangerously impaired.

In Dr. Brook's opinion, Rubalcava's 1991 offense against his niece was predatory because Rubalcava lived primarily on the streets and in board and care homes; although Rubalcava stayed with his sister from time to time, there was no indication that he had an ongoing substantial or meaningful relationship with his niece.

---

[5]     Dr Brook explained that there is no "cure" for paraphilia; and the fact that Rubalcava had not "sexual[ly] act[ed] out" since 2006 did not affect his opinion regarding Rubalcava's diagnosis. He attributed Rubalcava's lack of offending since 2006 to the "controlled environment and that his medication regimen is under the control of others."

Based on Rubalcava's diagnosed mental disorder, Dr. Brook was of the opinion that Rubalcava was likely to engage in sexually violent predatory behavior because of his diagnosed mental disorder.

Dr. Brook did not believe that Rubalcava was a good candidate for outpatient treatment because, based on Rubalcava's past history, he did not think that Rubalcava would continue to take his medication.

Dr. Stephen Hurwitz, a psychiatrist at Coalinga State Hospital, diagnosed Rubalcava with bipolar disorder with psychotic features. In his opinion, Rubalcava has good insight into his illness and has been taking his medication.[6] Dr. Hurwitz stated that Rubalcava was stable and doing well on his current regime and he believed that Rubalcava could be safely treated in the community. However, Dr. Hurwitz could not offer any opinion as to whether Rubalcava would commit future crimes. Dr. Hurwitz conceded that if Rubalcava went off his medication his symptoms would return.

Psychologist Dr. Brian Abbott testified that Rubalcava suffers from bipolar disorder, but it is in partial remission and this does not predispose Rubalcava to commit sexually violent acts. However, Dr. Abbott opined that Rubalcava does not suffer from a diagnosed mental disorder as defined by the SVPA and, therefore, does not meet the criteria necessary for civil confinement. Since Rubalcava had not committed any acts of indecent exposure since 2006, Dr. Abbott believed that Rubalcava's bipolar disorder was stabilized. Dr. Abbott thought that Rubalcava's acts of indecent exposure were not sexually violent offenses; and there was no indication that Rubalcava was struggling with urges to commit sexually violent behavior when he exposed himself.

---

[6] Dr. Hurwitz explained what he meant by Rubalcava having insight into his illness. Specifically, he stated that Rubalcava understands that he has bipolar disorder and that the medication he is on helps to "even out his moods," to "have virtually eliminated the hallucinations" and that he "needs the medications for his illness."

24

Psychologist Laljit Sidhu testified that Rubalcava suffers from bipolar disorder with psychotic features and polysubstance dependence, and that he has an antisocial personality disorder. In Dr. Sidhu's opinion, Rubalcava would not continue taking his medication if released from hospital and his bipolar symptoms would return. However, Dr. Sidhu did not believe that Rubalcava met the criteria for SVP commitment based on his bipolar disorder because the disorder compelled Rubalcava to commit acts of indecent exposure, not sexually violent acts. Dr. Sidhu opined that Rubalcava would continue to expose himself. However, he admitted that he could not say that Rubalcava is "never going to do a hands-on offense. That's not something I can, obviously, predict."

Both Dr. Brook and Dr. Abbott testified that Rubalcava had consistently claimed to have raped a four-year-old girl when he was between eight and 12 years old. Dr. Murphy testified that she had talked to Rubalcava about this incident and he told her that sometime between the age of eight and 12 he took a four-year-old girl to a field and had intercourse with her. Dr. Murphy was not sure if this incident occurred or was "a product of delusion." Dr. Murphy said that even if she took her pedophilia diagnosis out of consideration, i.e., if this event was just a delusion, her conclusion about Rubalcava would not change because the delusion spoke "to [Rubalcava's] potential risk to children in the community if he maintains delusional beliefs about . . . an imagined victim, or maybe someone he saw . . . ."

As with any challenge to the sufficiency of the evidence, we review the evidence as set forth *ante* in the light most favorable to the verdict to determine whether substantial evidence supports the SVP finding. (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466.) "[T]his court may not redetermine the credibility of witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment. [Citation.]" (*People v. Poe* (1999) 74 Cal.App.4th 826, 830.) In particular, we do not reassess the credibility of experts or reweigh the relative strength of their conclusions. (*Ibid*.) "The testimony of one witness, if believed, may be sufficient to

25

prove any fact. [Citation.]" (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508.)

Rubalcava argues that he has not engaged in any criminal sexual conduct since 2006; and according to his doctors his medication is what has made the difference. He asserts that it is undisputed that he has some mental disorder but the symptoms of that disorder must be such that it makes it difficult or impossible for him to control volitional behavior. Rubalcava contends that is not the case here. According to all the doctors, he is taking medication that controls his symptoms to the point that he is no longer acting on them. Rubalcava avers that "the law is clear that the court has to receive substantial evidence that [he] is currently suffering from a mental condition that affects his ability to control his behavior, which results in the risk of committing future sexually violent predatory crimes. The court received no such evidence in this case; the commitment order was based on insufficient evidence; and therefore, requires reversal."

Rubalcava goes on to argue, "There was no evidence that [he] would be a danger to the health and safety of others if under the supervision of the parole department in the community. To reach the conclusion that he might be a danger, the experts hypothesized that *if* he were released *and if* he stopped taking his medication *and if* his symptoms again became active, *then* he *might possibly* be a danger. Under this long string of hypothetical postulates, no mentally ill person could ever be released, as there is always a possibility that any one of the conditions could occur."

Inasmuch as Rubalcava's argument implies that the experts may not use his past crimes as evidence of his current mental disorder, we point out that experts may properly consider a defendant's past crimes in assessing whether he currently suffers from a mental disorder. (See *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1163-1164 [noting the United States Supreme Court has consistently upheld commitment schemes authorizing the use of prior dangerous behavior to establish both present mental impairment and the likelihood of future harm].)

26

Moreover, in forming their diagnoses, Drs. Korpi, Murphy, and Brook not only reviewed Rubalcava's criminal and hospital records, but also interviewed Rubalcava in person. Thus, their diagnoses were based in part on their recent interviews with Rubalcava, and not just the circumstances of his prior offenses. Rubalcava cites no authority that a different type of evidence is necessary to support an expert's diagnosis.

Furthermore, the SVPA asks "whether, as the result of a diagnosed mental disorder, the person presents a *substantial danger* of reoffense if *released without conditions*, or whether instead he is safe only if restrained, supervised, and treated involuntarily under the Director's custody." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 926-927.) As the court explained in *People v. Sumahit* (2005) 128 Cal.App.4th 347, Rubalcava "errs in supposing that he must presently engage in overt manifestations of a sexually violent predator in order to support an opinion that he still suffers from a mental disorder affecting his ability to control his impulses. The fact that defendant has not misbehaved in a strictly controlled hospital environment does not prove he no longer suffers from a mental disorder that poses a danger to others . . . . [The] lack of outward signs of sexual deviance is not dispositive of whether he is likely to reoffend if released into society at large. Such an assessment must include consideration of his past behavior, his attitude toward treatment and other risk factors applicable to the facts of his case." (*Id.* at p. 353.) The fact that currently Rubalcava is not exhibiting any symptoms of his mental disorder does not mean that currently he does not have a mental disorder that affects his ability to control his behavior.

Dr. Korpi testified that he did not believe that Rubalcava would continue to stay on medication voluntarily if released, because prior to 2006 he had a long history of failing to take his medication. Moreover, as recently as 2012, Rubalcava stopped taking his medication and began hallucinating again. In February 2013, Rubalcava told Dr. Sidhu that he was taking his medication only to satisfy the court, from which

27

Dr. Korpi concluded that Rubalcava does not fully understand his psychosis and need for medication.

Like Dr. Korpi, Dr. Brook and Dr. Murphy opined that Rubalcava had not acted out sexually because he was in a structured hospital setting on medication that was under the control of others. Even Dr. Sidhu, Rubalcava's expert, testified that he did not believe Rubalcava would take his medication if set free in the community, and that Rubalcava's bipolar symptoms would return. Thus, there was substantial evidence that if he were released, Rubalcava's disorder made it likely that he would engage in sexually violent criminal conduct. In other words, Rubalcava currently lacks control over his behavior and would be a danger to the health and safety of others if released because he would not remain on his medication voluntarily.

Finally, Rubalcava contends that there was insufficient evidence presented to court that if he is released he is likely to engage in crimes that are sexually violent and predatory in nature. Rubalcava argues there was no evidence that his mental condition predisposes him to engage in predatory sexually violent acts; "[t]he doctors opined that if [he] engaged in any future acts of sexual conduct, it would most likely be an indecent exposure charge, which is not 'sexually violent,' as defined by the SVP Act." Rubalcava makes this assertion without citation to the record.

Rubalcava misconstrues the doctors' testimony. On cross-examination Dr. Korbi conceded that the Static 99-R was "capturing" the likelihood that Rubalcava would be charged with indecent exposure. However, Dr. Korbi's conclusion that Rubalcava was likely to engage in predatory sexually violent acts was based on more than the Static 99-R. Dr. Korbi took into consideration the fact that Rubalcava had "two violent convictions," "five violent arrests—arrests for . . . 'violent behavior' and three arrests for

non-violent behavior." Dr. Korpi concluded, "[y]ou can't predict he's going to do just another 314."[7]

Similarly, Dr. Murphy conceded that the scores on the actuarial instruments indicated that Rubalcava "could" commit "just" another indecent exposure; this is a far cry, however, from Rubalcava's assertion that all the doctors agreed that Rubalcava's next crime would most likely be an indecent exposure offense.[8]

Dr. Korpi conceded that Rubalcava's 1991 offense against his niece, though sexually violent, was not predatory, but he noted that Rubalcava numerous indecent exposure offenses were against strangers and therefore qualified as predatory. On the other hand, Dr. Brook considered Rubalcava's 1991 offense against his niece to be predatory because Rubalcava had lived his life primarily on the streets and in board and care homes; and although he had stayed with his sister from time to time, there was no indication that Rubalcava had an ongoing, substantial meaningful relationship with his niece.

Dr. Korpi testified that Rubalcava's psychosis has affected his emotional and volitional capacity and has predisposed him to commit sexually violent predatory crimes; Dr. Murphy testified that if Rubalcava stopped taking his medication he was likely to reoffend in a sexually violent and predatory manner; and Dr. Brook testified that Rubalcava was likely to reoffend in a sexually violent predatory manner.

Rubalcava does not cite any evidence admitted at trial that shows the testing and evaluations conducted by the three doctors were inherently unreliable. Reviewing the entire record most favorably to the verdict and drawing all reasonable inferences from the

---

[7] A violation of Penal Code section 314 is indecent exposure.

[8] We note for the record that there was evidence presented that during one of Rubalcava's indecent exposure incidents he grabbed the victim's breast—Rubalcava so admitted to several people—and during another indecent exposure incident the facts underlying the incident indicated that Rubalcava grabbed the victim's buttocks. Dr. Korbi designated these incidents as "violent."

29

evidence to support it, we conclude there is substantial evidence to support the court's finding that Rubalcava is likely to engage in sexually violent criminal behavior that is predatory. Dr. Murphy testified that in her opinion Rubalcava met all of the requirements of a sexually violent predator; she specifically testified that if Rubalcava stopped taking his medication it was likely he would reoffend in a sexually violent and predatory manner. Dr. Korbi testified that because of Rubalcava's mental disorder he was likely to engage in sexually violent predatory criminal behavior. Further, given Dr. Korpi's testimony that he could not predict that Rubalcava was going to commit only indecent exposure offenses, and in light of Dr. Brook's testimony that Rubalcava's qualifying offense was predatory in nature, and the evidence that at least some of Rubalcava's indecent exposure offenses were accompanied by "violence," there was substantial evidence that Rubalcava is likely to engage in sexually violent criminal conduct that is predatory. (See *People v. Bowers* (2006) 145 Cal.App.4th 870, 879 [single mental health expert opinion constitutes substantial evidence].) Rubalcava does not challenge Dr. Murphy's, Dr. Korbi's, or Dr. Brook's qualifications or the foundation for their opinions.

## *Disposition*

The court's commitment order is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

PREMO, Acting P. J.


_____

MIHARA, J.